FILED US District Court-UT
AUG 23 '23 PM 12:10

TRINA A. HIGGINS, United States Attorney (#7349)
ADAM S. ELGGREN, Assistant United States Attorney (#11064)
TRAVIS K. ELDER, Assistant United States Attorney (#11987)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682
Email: adam.elggren@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| UNITED STATES OF AMERICA, Plaintiff, vs. DARREN ROSENSTEIN, Defendant. | 2:22-CR-352 JNP<br><br>SUPERSEDING INDICTMENT<br><br>Counts 1-4: 18 U.S.C. § 1343, Wire Fraud<br><br>Counts 5-8: 18 U.S.C. § 1957, Money Laundering |
|---|---|

The Grand Jury Charges:

## BACKGROUND

At all times relevant to this Indictment:

1. DARREN ROSENSTEIN was a resident of Utah, residing principally in Salt Lake County.

2. ROSENSTEIN was the owner and sole proprietor of Structural Integrity, LLC, Structural Integrity Engineering, Inc., and Sandy Real Estate Holding, LLC, Utah corporations; and CDFI Investments, LLC, a California corporation.

### The Small Business Administration

3.      The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small business and by assisting in the economic recovery of communities after disasters.

4.      As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders. The federal government backed these loans. The SBA also directly provided some loans.

### The Economic Injury Disaster Loan Program

5.      The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $10 billion to expand the SBA's Economic Injury Disaster Loan (EIDL) program.

6.      In order to obtain an EIDL, a qualifying business was required to submit a loan application to the SBA signed by an authorized representative of the business. The EIDL application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the loan.

7.  If approved as a borrower, the EIDL applicant would enter into a loan agreement with the SBA. EIDL applications and agreements are processed, and loans funded, by the SBA. Data in the application and agreement, including background information about the applicant and the certifications required to be made by the applicant, were transmitted by wire to the SBA in the course of processing the loan.

The Paycheck Protection Program

8.  The Paycheck Protection Program was another source of economic relief implemented by Congress as part of the CARES Act. The PPP authorized up to $349 billion in U.S. taxpayer funds to go toward forgivable loans to small businesses for job retention and certain other expenses.

9.  As with an EIDL loan, the PPP required a qualifying business to submit a loan application signed by an authorized representative of the business. But unlike the EIDL program, the PPP applications were sent to a participating financial institution first, then transmitted for further review to the SBA to assess eligibility. If the loan application was approved, the participating financial institution would fund the PPP loan. As with the EIDL applications, PPP applications required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the loan.

10. PPP loan proceeds were required to be used by the business on specified expenses: payroll costs, interest on mortgages, rent and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the proceeds on

3

these expenses within a designated period of time (usually within eight weeks of receiving the proceeds) and used at least 75% of the loan proceeds on payroll expenses.

Required Certifications and Limits on Use of Funds - EIDL

11. EIDL applications required applicants to make a number of factual certifications and assertions, under penalty of perjury, in order to be eligible for a loan under the program. One such assertion was to the "Gross Revenues for the Twelve (12) Month Prior to the Date of the Disaster (January 31, 2020)" (sic).

12. Borrowers were required to attest to the truthfulness of their application upon penalty of perjury, and were given warnings about the possible civil and criminal penalties that could apply. They were also required to agree, with the same warnings, to abide by all the terms of the agreement, including, explicitly, not to misapply the proceeds of the loan.

Required Certifications and Limits on Use of Funds - PPP

13. In the PPP loan application, the applicant or representative was required to state, among other things, its number of employees and average monthly payroll expenses. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation to substantiate its payroll expenses.

14. PPP applications required the applicant to affirm that the funds would "be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant or representative was also required to acknowledge that they "understand that if the funds are used for unauthorized purposes, the federal government may pursue fraud charges."

## COUNTS 1-4
## 18 U.S.C. § 1343
## (Wire Fraud)

The Scheme to Defraud:

15. Paragraphs 1-14 are incorporated herein by reference.

16. Beginning in or around April 2020 and continuing until in or around May 2022, in the District of Utah and elsewhere, defendant DARREN ROSENSTEIN, knowingly and with intent to defraud, devised and executed a scheme and artifice to obtain monies, funds, credits, assets and other property owned by and in the custody and control of the SBA by means of materially false and fraudulent pretenses, representations and promises, and the concealment of material facts.

17. The fraudulent scheme operated and was carried out, in substance, as follows:

    a. Defendant ROSENSTEIN created loan applications under the EIDL loan program for his various businesses, including, Structural Integrity, LLC; Structural Integrity Engineering, Inc.; CDFI Investments, LLC; and Sandy Real Estate Holding, LLC. ROSENSTEIN made materially false representations and promises on the applications in order to induce the SBA to approve his businesses for the loans. One such representation was that his business CDFI Investments, LLC had gross revenues in the amount of $1,766,765 in the 12 months leading up to January 31, 2020, when, in fact, the company's revenues, if any, were significantly lower, which representation ROSENSTEIN knew to be false at the time he made it.

    b. Defendant ROSENSTEIN created loan applications under the PPP loan program for his various businesses, including, Structural Integrity, LLC and Structural

5

Integrity Engineering, Inc. ROSENSTEIN made materially false representations and promises on the applications in order to induce the SBA and lending institution to approve his businesses for the loans. One such representation was that his business Structural Integrity, LLC, had 29 employees and a monthly payroll of almost $60,000, when, in fact, that business had fewer than 10 employees and far less than $60,000 in monthly payroll expenses.

  c. Defendant ROSENSTEIN then received the funds and failed to use them solely for the legitimate business expenses described on the website and specified in the agreements, but instead used them for non-legitimate purposes including, but not limited to, transfers into other bank accounts he controls and deposits into an investment account for his personal benefit.

Execution of the Scheme – Use of Wires:

18. Paragraphs 1-17 are incorporated herein by reference.

19. On or about the following dates, in the District of Utah and elsewhere,

DARREN ROSENSTEIN,

defendant herein, for the purpose of executing and attempting to execute the above-described scheme to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count (all dates are 'on or about'):

| COUNT | DATE | USE OF INTERSTATE WIRES | DESCRIPTION |
|---|---|---|---|
| 1 | 5/6/2020 | Loan application #...4583 transmitted via Internet to SBA by ROSENSTEIN on behalf of CDFI Investments, LLC for an EIDL loan in the amount of $150,000 | EIDL program application wherein ROSENSTEIN falsely attested that CDFI Investments, LLC had $1,766,765 in gross revenues in the 12 months prior to January 31, 2020; in fact, that company's gross revenues were negligible |
| 2 | 5/19/2020 | Wiring of funds in the amount of $149,900 from SBA to JP Morgan Chase Bank, NA account ending in ...6927 owned by CDFI Investments, LLC (see Count 1 above) | Wire of funds (less $100 fee) induced by ROSENSTEIN'S false attestations on the application for the CDFI Investments, LLC EIDL loan regarding overstatement of revenue |
| 3 | 2/24/2021 | Loan application for SBA loan #...8507 transmitted via Internet to SBA by ROSENSTEIN on behalf of Structural Integrity, LLC for a PPP loan in the amount of $149,647 | PPP program application wherein ROSENSTEIN falsely attested that Structural Integrity, LLC had 29 employees and an average monthly payroll of $59,859; in fact, at that time, Structural Integrity, LLC had far fewer than 29 employees and little payroll |
| 4 | 3/16/2021 | Wiring of funds in the amount of $149,647 from SBA to JP Morgan Chase Bank, NA account ending in ...9624 owned by Structural Integrity, LLC (see Count 3 above) | Wire of funds induced by ROSENSTEIN'S false attestations on the application for the Structural Integrity, LLC PPP loan regarding overstatement of employees and payroll expenses |

all in violation of 18 U.S.C. § 1343.

## COUNTS 5-8
## 18 U.S.C. § 1957
## (Money Laundering)

20.     Paragraphs 1-19 are incorporated herein by reference.

21.     On or about the dates listed below, in the District of Utah and elsewhere,

DARREN ROSENSTEIN,

7

Defendant herein, did engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, in the manner described below, such property having been derived from a specified unlawful activity, that is, Wire Fraud in violation of 18 U.S.C. § 1343, as alleged in Counts 1-4 above, which counts are incorporated herein by reference:

| COUNT | DATE | MONETARY TRANSACTION |
|---|---|---|
| 5 | 8/19/2020 | Wire transfer in the amount of $100,000 from JP Morgan Chase Bank, NA checking account #...6927 (CDFI Investments, LLC) to JP Morgan investment account #...2033 (JPMC Securities CDFI Investments) both controlled by DARREN ROSENSTEIN |
| 6 | 4/18/2022 | Transfer of $108,760 from JP Morgan Chase Bank, NA account #...2033 to JP Morgan Chase Bank, NA account #...6927, both controlled by DARREN ROSENSTEIN |
| 7 | 5/31/2022 | Transfer of $15,000 from JP Morgan Chase Bank, NA account #...6927 to JP Morgan Chase Bank, NA account #...6489 (Sandy Real Estate Holding, LLC), both controlled by DARREN ROSENSTEIN |
| 8 | 5/31/2022 | Transfer of $15,000 from JP Morgan Chase Bank, NA account #...6927 to JP Morgan Chase Bank, NA account #...9624 (Structural Integrity, LLC), both controlled by DARREN ROSENSTEIN |

all in violation of 18 U.S.C. § 1957, Money Laundering.

NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense violating 18 U.S.C. § 1343, the defendant(s) shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds

traceable to the scheme to defraud. The property to be forfeited includes, but is not limited to:

- A money judgment equal to the value of any property not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p).

- Substitute property as allowed by 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. § 1957, the defendants shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property. The property to be forfeited includes, but is not limited to:

- A money judgment equal to the value of all property not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p); and

- Substitute property as allowed by 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p).

A TRUE BILL:

/S/
FOREPERSON OF GRAND JURY

TRINA A. HIGGINS
United States Attorney

ADAM S. ELGGREN
Assistant United States Attorney